268                426 Mass. 268 (1997)

The Parish of the Advent *v.* The Protestant Episcopal Diocese of Massachusetts.

## THE PARISH OF THE ADVENT *vs.* THE PROTESTANT EPISCOPAL DIOCESE OF MASSACHUSETTS & others.[1]

Suffolk. January 7, September 9, 1997. - December 17, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Religion. Church. Constitutional Law,* Freedom of religion. *Jurisdiction,* Ecclesiastical controversy.

This court concluded that the Protestant Episcopal Church is hierarchical, with the result that a judge of the Superior Court was without jurisdiction to decide a dispute involving questions of church governance: the First and Fourteenth Amendments to the Constitution of the United States required the dismissal of a civil action arising out of an Episcopal church parish's attempt to secede from its diocese and from the Protestant Episcopal Church of the United States. [280-286]

This court concluded that State law does not preclude a religious corporation established under State statute from undertaking in its constitution to accede to the authority of a higher ecclesiastical body concerning matters of church governance. [286-288]

A Superior Court judge correctly concluded that the First Amendment precluded his exercise of jurisdiction to determine whether certain members of a Protestant Episcopal parish who had voted to withdraw from the diocese and from the Protestant Episcopal Church of the United States were ineligible to serve as members of the corporation of the parish. [288-289]

CIVIL ACTION commenced in the Superior Court Department on October 21, 1994.

The case was heard by *Charles F. Barrett,* J., on motions for summary judgment, and entry of separate and final judgment was ordered by him.

The Supreme Judicial Court granted applications for direct appellate review.

[1]The Right Reverend David E. Johnson (now deceased); the Right Reverend M. Thomas Shaw, his successor; Reverend Andrew C. Mead, rector; trustees of various trusts of the Parish of the Advent; certain members of the Parish of the Advent and members of the vestry of the Parish; and certain members of the nominating committee appointed by Bishop Johnson.

*Stephen W. Howe & Diane C. Tillotson* for the Protestant Episcopal Diocese of Massachusetts & others.

*Rory FitzPatrick (Phoebe S. Gallagher & William O. Rizzo,* with him) for the Parish of the Advent.

*Dennis M. Powers,* pro se.

MARSHALL, J. This case concerns a protracted dispute between certain members of the corporation of the Parish of the Advent (Parish) on the one hand, and the remaining members of the corporation, members of the Parish vestry (vestry), the Parish rector, the Protestant Episcopal Diocese of Massachusetts (Diocese), and the Massachusetts Diocesan bishop (bishop) on the other. The dispute was triggered when a majority of the members of the Parish corporation passed a vote of no confidence in the rector of the Parish at a special meeting in September, 1993.

In connection with this case we have granted two applications for direct appellate review. First, the defendants appealed from the order of a judge in the Superior Court, dated October 25, 1995, granting summary judgment and injunctive and declaratory relief in favor of the plaintiff.[2] The order enjoined the implementation of a "godly judgment" issued by the bishop on December 7, 1994, that required all vestry members to resign before the expiration of their terms, and the election of new vestry members in accordance with procedures specified by the bishop.

Second, the plaintiff appealed from a later order of the same judge dated December 10, 1996, granting summary judgment and declaratory relief in favor of the defendants and from the separate and final judgment entered January 10, 1997. The second order declared that, in accordance with the Parish constitution and the constitution and canons of the Diocese, the corporation could not amend the Parish constitution without the authorization of the Diocese; that the new members of the vestry elected democratically in accordance with Diocesan canons[3] were the recognized representatives of the Parish under canon law, State law, and the Parish constitution, and had control of the day-to-day operations of the Parish; and that the Superior Court was without jurisdiction to decide whether thirteen

---

[2]As described below, the order was modified on January 26, 1996.

[3]The Diocesan canons were amended in November, 1995, to provide for the democratic election of all parish vestries in the Diocese.

members of the Parish corporation who had voted to withdraw from the Diocese and the Protestant Episcopal Church in the United States of America (PECUSA) were precluded from serving as members of the Parish corporation.

We conclude that this dispute concerns a matter of internal church government within a hierarchical religious organization, "an issue at the core of ecclesiastical affairs." *Serbian E. Orthodox Diocese for the U.S. & Can.* v. *Milivojevich,* 426 U.S. 696, 721 (1976). As such, the First and Fourteenth Amendments of the United States Constitution require that we accept as binding the interpretation of the constitution and canons of PE-CUSA and the Diocese by the bishop, the highest ecclesiastical authority for adjudicating these issues. See *Serbian E. Orthodox Diocese, supra* at 724-725; *Fortin* v. *Roman Catholic Bishop of Worcester,* 416 Mass. 781, 785, cert. denied, 511 U.S. 1142 (1994). We further conclude that State law does not preclude a Massachusetts religious corporation from undertaking in its constitution to accede to the authority of a higher body concerning matters of church governance. We vacate the order of the Superior Court entered on October 25, 1995, and the order and final judgment entered on January 10, 1997, and order that the complaint be dismissed.

I

A

The following pertinent facts are undisputed or have been established by the defendants. PECUSA, established in 1789,[4] consists of ninety-five geographical dioceses, of which the Massachusetts Diocese is one, each presided over by a bishop, the ecclesiastical authority of the diocese. PECUSA is governed by a constitution and canons adopted at the general convention of the Church, the legislative body of PECUSA. All affiliated dioceses and local parishes are bound by PECUSA's constitution and canons.

Each diocese of PECUSA is comprised of a confederation of parishes located in its geographical area. Each diocese, in turn, has its own constitution and canons by which the diocese and each local parish are also bound. As the ecclesiastical authority

---

[4]PECUSA "was the product of secession of the Anglican church in the colonies from the Church of England." *Bennison* v. *Sharp,* 121 Mich. App. 705, 710 (1982).

426 Mass. 268 (1997)                                             271

The Parish of the Advent *v*. The Protestant Episcopal Diocese of Massachusetts.

within each diocese, it is the responsibility of the bishop to ensure that the affairs of each parish within the diocese are conducted in accordance with the canons and constitution of the diocese and of PECUSA.[5]

Of relevance to this dispute, the constitution and the canons of the Massachusetts Diocese provide that a parish may be organized only with the consent of the bishop and the standing committee of the Diocese,[6] and only if the constitution and bylaws of the proposed parish have been approved by the bishop and the standing committee. To receive authorization, the constitution and bylaws of each parish must contain a statement acceding to the doctrine, discipline, and worship of PECUSA prescribed by its constitution and canons and by the constitution and canons of the Diocese. In short, through each diocese PECUSA exercises pervasive control over its constituent parishes.

We turn to describe the Parish, and the history of its relationship to the Diocese and PECUSA. The Parish was founded in 1844. Although the Parish was one of the first churches in this country to embrace the Anglo-Catholic movement, and was one of the first to abandon the mandatory requirement of pew rents as a means of support, since its inception the Parish has been affiliated with PECUSA and the Diocese, adhering to their respective constitutions and canons. Prior to its establishment, and as mandated by PECUSA, the founders sought and received the permission of PECUSA to incorporate as a parish of the Diocese and to hold worship services.[7] It is not disputed that, from its inception until this dispute arose in 1993, the Parish adhered to the constitutions and canons of the Diocese and PE-

---

[5]Laity play an important role in the organization and governance of the Episcopal Church, at both the national and diocesan level. The general convention (national) is comprised of a house of bishops, to which all consecrated Episcopal bishops in the United States belong, and a house of deputies made up of clergy and laity elected from the dioceses. Dioceses, in turn, are governed by diocesan conventions, in which both the clergy and laity participate, with lay delegates elected from every parish and mission within the diocese. The relationship between the ecclesiastical authorities and the laity, and the powers with respect to each, are set forth in the constitution and canons of PECUSA and each diocese respectively.

[6]The standing committee consists of four "presbyters" and four lay persons elected at the annual diocesan convention. According to the canons of the Diocese and of PECUSA, the standing committee serves as a "council of advice" to the Diocesan bishop.

[7]The corporation was organized pursuant to St. 1834, c. 183, § 6, codified at Rev. St. 1836, c. 20, § 28. See generally G. L. c. 67.

CUSA, respectively. The Parish regularly sent delegates to the annual Diocesan conventions, see note 5, *supra*, and regularly accepted appointments to various permanent bodies and positions within the Diocese. Consistent with the constitutions of the Diocese and PECUSA, the Parish has always been financially self-sufficient,[8] and has always complied with all the required financial and other reporting requirements imposed by the canons of PECUSA and the Diocese. The members of the Parish corporation[9] elect the rector for the Parish subject to consultation with the bishop. See Canon 15 of the Canons of the Diocese.

Until 1960, the constitution of the Parish had not been amended in any significant respect.[10] In 1960, an occasion arose

[8]The plaintiff notes the corporation's "independence" because the Parish has "been financially self-sufficient throughout its history. It has received no financial assistance from the Diocese or [PECUSA]." This is a requirement of both PECUSA and the Diocese and, in this respect, the Parish is no different from many other parishes of the Diocese. Although a number of parishes receive some financial assistance from time to time from the Diocese, a great many, like the Parish, have never received any financial assistance. The Parish, like others in the Diocese, consistently has always paid the mandatory portion of any required assessment to the Diocese.

[9]Members of the corporation should be distinguished from the communicants of the Parish. Communicants are those congregants who have received holy communion at least three times during the preceding year. See Canon 16 of the Diocese. Article 13 of the Parish constitution requires that one-half of the members of the corporation be "stated worshippers [*sic*] at the Parish church." The Parish constitution provides that the members of the corporation shall number no less than twelve and no more than twenty. The officers of the corporation consist of two "wardens," five to nine "vestrymen," a treasurer, and a clerk. According to the Parish constitution, the wardens and a majority of the vestrymen were to be chosen from the members of the corporation. Members of the vestry administer the secular affairs of the Parish.

[10]Only arts. IV, VI and XII were amended, each in minor respects. Article IV originally provided, in part, that "vacancies [for the position of member in the corporation] shall be filled by a vote of the majority of members present at the annual meeting hereinafter provided for; or at any meeting specially notified." The amended art. IV reads in relevant part that "no member shall be elected unless by a vote in his favor of a majority of all the members of the Corporation for the time being who shall be and are entitled to vote." Article VI, which governs the holding of special meetings, was amended to allow the notice of a special meeting to be provided by mail, as well as by person and by hand, as provided originally. Article XII was amended to change the quorum requirement for a meeting of the corporation from nine to seven persons.

that resulted in an amendment to art. I of the Parish constitution that is central to our inquiry. In April of that year, the Parish corporation voted to amend art. III of the Parish constitution that related to the geographical requirements for membership in the Parish corporation.[11] Under the terms of the Diocesan constitution then, as now, the Parish was required to submit any proposed amendment of its constitution to the bishop and the standing committee of the Diocese for authorization.[12] The Parish corporation did so, without question or controversy. The bishop and the standing committee of the Diocese granted their authorization to the proposed amendment, subject, however, to one important consideration. As described above, at some time after its founding, PECUSA and the Diocese concluded by canonical mandate that the constitution and bylaws of each local parish should provide explicitly that every parish accede to the "doctrine, discipline and worship and the constitution and canons" of PECUSA and the Diocese. Because the constitution of the Parish predated this canonical requirement, the original constitution did not contain this explicit reference. In 1960, the

---

[11]The original version of art. III provided: "No person shall be a member of this Corporation who has not either his residence or place of business in the City of Boston or within *ten* miles of the State House; or who is a member of any other communion than that to which this parish is attached" (emphasis supplied). In 1960, the Parish corporation sought to amend the constitution to allow its members to reside or have a place of business within *fifty* miles of the State House.

[12]Article XIII, § 1, of the constitution of the Diocese provides:

"No change in the articles of the association, charter, Constitution or by-laws of any parish, mission or summer chapel shall be made or become effective except as follows: first, the substance of the proposed change shall be approved by vote of the parish, mission or summer chapel; next, the proposed change shall be submitted to the Bishop and Standing Committee. If approved by them without substantial revision, the change as so approved shall become effective immediately upon receipt by the parish, mission or summer chapel clerk of notice thereof. If the Bishop and/or Standing Committee shall approve subject to a substantial revision, affecting the intent or meaning of the proposed change, the matter shall be resubmitted to the parish, mission or summer chapel body which originally voted the change; and the change as so revised shall become effective upon the further vote of such body. If any such proposed change is not approved within a reasonable time by the Bishop and Standing Committee, the parish, mission or summer chapel may appeal to the Convention, whose decision shall be final."

bishop and the standing committee of the Diocese, accordingly, informed the Parish corporation that the authorization of the proposed amendment to art. III would be forthcoming if the following amendment to art. I of the Parish constitution were adopted:

> "The name of this corporation shall be the 'Parish of the Advent'; and its objects are to secure to a portion of the City of Boston the ministrations of the Holy Catholic Church, and more especially to secure the same to the poor and needy, in a manner free from unnecessary expense and all ungracious circumstances; and for this purpose this Parish *accedes to the Doctrine, Discipline, and Worship and the Constitution and Canons of the Protestant Episcopal Church in the United States of America, and to the Constitution and Canons of the Protestant Episcopal Diocese of Massachusetts, and acknowledges their authority*" (emphasis supplied).[13]

The standing committee of the Diocese informed the Parish corporation that the change was required to ensure that "the authority . . . of the Diocese is acknowledged. The [Parish] Constitution being an ancient one does not comply with this standard." The required amendment to the Parish constitution was duly considered by the Parish corporation and, in April, 1961, the Parish corporation amended art. I of the Parish constitution, making explicit its accession to the authority of the Diocese and PECUSA.[14]

---

[13]The original language of art. I of the Parish constitution provided:

> "The name of this corporation shall be the 'Parish of the Advent'; and its objects are to secure to a portion of the City of Boston the ministrations of the Holy Catholic Church, and more especially to secure the same to the poor and needy, in a manner free from unnecessary expense and all ungracious circumstances; and for this purpose, *it is in connection with the Protestant Episcopal Church of the United States, and with the Diocese in which the Parish is situated, and with the Convention of the same*" (emphasis supplied).

[14]It is noteworthy that, at the time, some (perhaps all) members of the Parish corporation concluded that the amendment may not have been required because the then existing language of Article I of the Parish constitution (the Parish is "in connection with" PECUSA and the Diocese), in their view,

426 Mass. 268 (1997) 275

The Parish of the Advent *v.* The Protestant Episcopal Diocese of Massachusetts.

## B

The present controversy between some members of the corporation and the majority of the Parish communicants and the Diocese began in September, 1993, following disputes between the then Parish rector, Reverend Andrew C. Mead, and certain (but not all) corporation members. A bare majority passed a vote of "no-confidence" in the rector at a special meeting of the corporation.[15] The canons of PECUSA and the Diocese contain a set of required procedures that govern the resolution of any dispute between a rector and a parish. These include a provision for mediation (Title III, Canon 20)[16] and, in the event that mediation is not successful, the rendering of a "godly judgment" by the bishop after consultation with the diocesan standing committee (Title III, Canon 21).[17] Canon 21 of Title III of PECUSA specifically provides that no rector may

embodied this same accession of the Parish to the authority of PECUSA and the Diocese. At that time no member of the corporation seems to have been in doubt that the Parish was then, as always, subject to PECUSA and the Diocese.

[15]The record does not establish the precise contours of the dispute. It is clear that it concerned, at least in part, the relationship between the rector, the corporation, the vestry, and the Parish congregation and perceived attempts by some corporation members to remove the rector from his position. In his December 7, 1994, godly judgment, the bishop stated: "the election of a Rector by a Parish and the Rector's assent to such an election forms a relationship that can be dissolved under only the most serious circumstances. This relationship requires the best efforts of the parochial lay leadership and the Rector. . . . [T]he Corporation and Vestry did not effectively and appropriately discharge their responsibilities. . . . [I]t is clear that the lay leadership of the Congregation wished to resolve the problems not through mutual growth but rather through the departure of the Rector."

[16]Canon 20 of Title III of the canons of PECUSA provides in relevant part:

"When the pastoral relationship in a parish between a Rector and the Vestry or Congregation is imperiled by disagreement or dissension, and the issues are deemed serious by a majority vote of the Vestry or the Rector, either party may petition the Ecclesiastical Authority, in writing, to intervene and assist the parties in their efforts to resolve the disagreement. . . . The parties to the disagreement, following the recommendations of the Ecclesiastical Authority, shall labor in good faith that the parties may be reconciled. . . ."

[17]Canon 21 of Title III of the canons of PECUSA provides in relevant part:

"Sec. 1. "[N]or may any Rector canonically or lawfully elected and in charge of a Parish be removed therefrom by the Vestry against the Rector's will, except as hereinafter provided. . . .

"Sec. 4. If the differences between the parties are not resolved after completion of the mediation, the Bishop shall proceed as follows:

be removed from office except as provided by the canons. In the wake of the vote of "no confidence," the rector asked the bishop[18] to intercede under Canon 20. Following the failure of efforts at mediation, on August 31, 1994, the rector asked the bishop to dissolve the rector's relationship with the Parish under Canon 21.

The Canon 21 procedure begins by giving "notice in writing to the Ecclesiastical Authority of the Diocese," the bishop. The bishop again attempts to mediate the dispute, Canon 21, § 3, and if this attempt fails, notice is sent to the rector and the parish that a "godly judgment" will be rendered after consultation with the standing committee. The parties are given an opportunity to confer with the standing committee before it consults with the bishop, the bishop confers with and receives the recommendation of the standing committee, and the bishop, "as final arbiter and judge," then renders a "godly judgment." Canon 21, § 4 (a)-(d). Both the rector and the Parish corporation participated in the Canon 21 proceedings.

On December 7, 1994, the bishop rendered his "godly judgment." He accepted the resignation of the rector. He further ordered the entire vestry of the Parish, including the wardens, clerk, and treasurer, to resign prior to the completion of their terms, and ordered the election of a new vestry by the communicants of the Parish. To bring about those changes, the

---

"(a) The Bishop shall give notice to the Rector and Vestry that a godly judgment will be rendered in the matter after consultation with the Standing Committee and that either party has the right within ten days to request in writing an opportunity to confer with the Standing Committee before it consults with the Bishop. . . .

"Sec. 6. In the event of the failure or refusal of either party to comply with the terms of the judgment, the Bishop may impose such penalties as may be set forth in the Constitution and Canons of the Diocese; and in default of any provisions for such penalties therein, the Bishop may act as follows:

". . .

"(b) In the case of a Vestry, invoke any available sanctions including recommending to the Convention of the Diocese that the Parish be placed under the supervision of the Bishop as a Mission until it has complied with the judgment."

[18]The bishop at the time, the Right Reverend David E. Johnson, subsequently deceased, was succeeded by the Right Reverend M. Thomas Shaw. See note 1, *supra*.

426 Mass. 268 (1997)                                    277

The Parish of the Advent v. The Protestant Episcopal Diocese of Massachusetts.

bishop ordered, among other things, that a meeting of all communicants of the Parish be held on January 29, 1995, to elect the new vestry. Two further aspects of the "godly judgment" are relevant to these proceedings. The bishop ordered the vestry to create new bylaws for the Parish in conformity with the model bylaws of the Diocese, but he noted that "the by-laws will in no way limit the congregation's ability to function in the Anglo-Catholic tradition which is its heritage." Second, the bishop confirmed that there was no intent "to change the legal ownership of real and personal property of the Parish of the Advent, title to which now vests in the Corporation."[19]

Meanwhile, in October, 1994, after the commencement of the Canon 21 procedure in which the Parish corporation had participated, but before the bishop issued his godly judgment, thirteen members of the Parish corporation voted to institute this lawsuit against the Diocese, the bishop, and others. On January 20, 1995, at the request of the plaintiff, a judge in the Superior Court enjoined the election of a new vestry. An overwhelming majority of communicants nevertheless met, and expressed support for the rector and the bishop, and indicated their lack of support for the corporation members who had initiated this litigation.

The defendants moved for partial summary judgment on the ground that the Superior Court lacked subject matter jurisdiction to decide this matter. The plaintiff filed a cross motion for summary judgment claiming that the bishop improperly had exceeded his authority under Canon 21 by calling for the election of a new vestry. On April 4, 1995, the judge in the Superior Court denied the defendants' motion, concluding that the court had jurisdiction to adjudicate the dispute because, in his view, the canons of PECUSA did not provide a "mechanism" for challenging a godly judgment. On October 25, 1995, the judge granted the plaintiff's cross motion for partial summary judgment because the bishop had "exceeded his authority" under Canon 21. The judge granted the parties' request for entry of partial final judgment, and we granted the defendants' application for direct appellate review.

---

[19]The corporation of the Parish is the record titleholder of the real estate located at 30 Brimmer Street, including the church sanctuary, the parish house, and the rectory located at 135 Mount Vernon Street. The Parish is also the beneficiary of several trusts.

## C

In the meantime, the second appeal had begun. In November, 1995, 530 lay and clerical delegates from all of the Diocesan parishes and missions voted at the annual Massachusetts Diocesan convention to amend Canon 14 of the Diocese to require all parishes to amend their bylaws or other corporate documents to provide for the democratic election of each parish vestry. See note 5, *supra*. In the wake of this amendment, the defendants moved for dissolution or modification of the January, 1995, injunction issued by the Superior Court judge. On January 26, 1996, the judge modified his earlier injunction to provide that nothing "shall prohibit any party from complying with the recently enacted Canon 14 [of the Diocese]."

Also, on January 26, 1996, thirteen corporation members initiated their attempt to secede from the Diocese and PECUSA. They called a meeting, the purpose of which was "to consider and act upon" an amendment to the Parish constitution to delete the language of the 1960 amendment to art. I. On February 1, 1996, the bishop advised them that such an amendment would be a nullity because every amendment to the Parish constitution required the authorization of the bishop and the Diocesan standing committee. See note 12, *supra*. Hitherto the Parish had not questioned that any amendment to its constitution was subject to the authorization of the bishop and the Diocesan standing committee.

The same thirteen members later met and voted to delete the accession language from art. I of the Parish constitution, and to withdraw the Parish from the Diocese and PECUSA. In February, 1996, the new bishop issued a further "godly judgment" requesting the vestry to rescind that vote, and requesting that the Parish elect new vestry members according to Diocesan Canon 14.[20]

On March 3, 1996, the Parish communicants elected a new vestry. They also voted to request the Diocese to reclassify the

---

[20]The bishop wrote that "no Rector could effectively minister to the communicants of the Parish of the Advent if it is allowed to maintain its present governance structure. . . . A Vestry that is appointed by a self-perpetuating body that systematically and flagrantly ignores the efforts and wishes of the parochial lay leadership among the communicants and the desire of the majority of the communicants is untenable. . . . The Parish of the Advent has always been a part of the Diocese of Massachusetts and has always been subject to the governance of the Standing Committee and the Bishop."

426 Mass. 268 (1997) 279

The Parish of the Advent v. The Protestant Episcopal Diocese of Massachusetts.

Parish as a "mission" under the bishop's supervision, as provided by Canon 14, § 4 of the Diocese,[21] to which the bishop and the standing committee agreed.[22] The following day, the seven members of the corporation who had not participated in the vote to secede unanimously voted to repudiate the decision to withdraw the Parish from the Diocese. They also elected nine new members of the corporation to replace those who had voted to secede from PECUSA.[23]

On May 3, 1996, the parties again filed cross motions for summary judgment. The plaintiff claimed that the actions of the thirteen corporation members did not disqualify them from serving on the corporation; that Massachusetts law provides that the members of the corporation have the sole right to control the Parish and to amend its constitution and bylaws; and that the March 4, 1996, meeting of the minority members of the corporation was invalid. The defendants responded that the new vestry was the legal representative of the Parish and that, in accordance with the Parish constitution, the thirteen members were disqualified from serving as members of the corporation because of their vote to secede.

On December 10, 1996, the same judge in the Superior Court ruled that the constitution of the Parish could not be amended without the authorization of the bishop and the diocesan standing committee; that the vestry elected by the communicants pursuant to Canon 14 had authority to manage the prudential affairs of the corporation; and that the Parish had been reclassified as a mission under the bishop's control. He also concluded that the court was precluded from deciding whether the thirteen seceding members remained as members of the corporation.

---

[21]Canon 14, § 4, of the Diocese provides: "A parish which has voted to request reclassification as a mission . . . may, after due notice of the proposed action has been given to the parish . . . and to the convener of the region in which the parish is located, be reclassified as a mission by the Bishop and the Standing Committee. The Secretary of the Standing Committee shall promptly notify the Secretary of the Convention of any such action." The bishop described the status of a mission as follows: "The day to day operations of a Mission are carried out by an elected Vestry which is referred to as . . . an Executive Committee. The Executive Committee of a Mission is subject to my supervision and can be disbanded on my order."

[22]On March 23, 1996, at a special diocesan convention, delegates throughout the Diocese of Massachusetts accepted the recommendation of the bishop and the standing committee to reclassify the Parish as a mission.

[23]In the second godly judgment the bishop decreed that, in light of their vote to secede, the thirteen were no longer members of PECUSA.

Final judgment entered and we granted the plaintiff's application for direct appellate review.

## II

The threshold question we face concerns the propriety of the Superior Court's exercise of jurisdiction over this case.[24] We have recognized that the "First Amendment prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization." *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. 781, 785 (1994), quoting *Alberts* v. *Devine*, 395 Mass. 59, 72, cert. denied sub nom. *Carroll* v. *Alberts*, 474 U.S. 1013 (1985). The question is whether this case concerns such a dispute.

Relying principally on *Serbian E. Orthodox Diocese for the U.S. & Can.* v. *Milivojevich*, 426 U.S. 696 (1976), the defendants claim that the Protestant Episcopal Church in the United States is hierarchical, that the dispute is one of internal discipline and government and that the First Amendment prohibits the court from deciding the dispute. See *Wheeler* v. *Roman Catholic Archdiocese of Boston*, 378 Mass. 58, 61, cert. denied, 444 U.S. 899 (1979) (First Amendment permits hierarchical religious organizations to establish their own rules for internal government). Relying on *Jones* v. *Wolf*, 443 U.S. 595 (1979), the plaintiff responds that the case has little to do with matters of religious doctrine, discipline, or faith. According to the plaintiff, the question is a different one: whether a religious corporation created under Massachusetts law can be "extinguished and stripped of its rights and its property in the name of ecclesiastical authority."

We consider, first, the issue of hierarchy. The question is relevant because "[i]t is in disputes involving hierarchical churches that civil courts must tread more cautiously, for the First Amendment 'permits hierarchical [churches] to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters.' " *Antioch Temple, Inc.* v. *Parekh*, 383 Mass.

---

[24]Early in the litigation the defendants moved for summary judgment for lack of subject matter jurisdiction. On April 4, 1995, the judge below denied that motion, concluding that, even if the Episcopal church is hierarchical, he was "unconvinced" that the church "maintains an ecclesiastical tribunal for the resolution of controversies of the type presented here."

854, 861 (1981), quoting *Wheeler, supra* at 61.[25] See *Serbian E. Orthodox Diocese, supra* at 709 ("the First and Fourteenth Amendments mandate that civil courts shall not disturb the highest ecclesiastical tribunal within a church of hierarchical polity").[26]

In *Fortin, supra* at 786-787, we noted that a church structure could be either hierarchical or congregational, or that it could be a mix of both, citing *Antioch Temple, supra* at 860-862. See *Primate & Bishops' Synod of the Russian Orthodox Church Outside Russia* v. *Russian Orthodox Church of The Holy Resurrection, Inc.*, 418 Mass. 1001 (1994), cert. denied, 513 U.S. 1121 (1995). In *Antioch Temple, supra*, we described the distinction between the two structures, observing that a congregational church "is strictly independent" and, so far as church government is concerned, "owes no fealty or obligation to any higher authority"; in a hierarchical church structure, in contrast, a local church is but "an integral and subordinate member of a larger, general church organization." *Antioch Temple, supra* at 860-861.

We conclude that the Protestant Episcopal Church is hierarchical. The constitution and canons of PECUSA detail the authority exercised by PECUSA through a diocese to each local

---

[25]In *Antioch Temple, Inc.* v. *Parekh*, 383 Mass. 854 (1981), we observed: "First Amendment considerations aside, such deference to the hierarchical tribunal is justified by general principles of private ordering. As explained by the United States Supreme Court "[a]ll who unite themselves to [a general church] do so with an implied consent to [its] government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have [it] reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.' " *Id.* at 861 n.8, quoting *Presbyterian Church in the U.S.* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 446 (1969).

[26]The judge below did not make a specific finding about the structure of PECUSA. In his October, 1995, order the judge said he "assumed" that the Episcopal Church was hierarchical. See *Antioch Temple, Inc.* v. *Parekh, supra* at 863, where we observed that "[t]he master made no explicit finding as to whether [the church] is congregational or hierarchical in structure. Nonetheless, his findings of fact lead us to conclude [the church] is a congregational church. . . . Our own examination of the corporate documents of both [the church and the national church organization] support[s] these conclusions that the church was congregational."

parish.[27] The constitution of the Diocese, in turn, provides that the Diocese "accedes to the doctrine, discipline and worship and to the Constitution and Canons" of PECUSA.[28] Article I of the constitution of the Parish, in turn, provides that the Parish accedes to the constitution and canons of PECUSA and the Diocese. In short, the national canons supersede diocesan canons, which themselves supersede a parish constitution. See *Protestant Episcopal Church* v. *Graves*, 83 N.J. 572, 580 (1980), cert. denied sub nom. *Moore* v. *Protestant Episcopal Church in the Diocese of N.J.*, 449 U.S. 1131 (1981).

In *Bennison* v. *Sharp*, 121 Mich. App. 705, 720 (1982), and in *Rector, Wardens & Vestrymen of Trinity-St. Michael's Parish, Inc.* v. *Episcopal Church in the Diocese of Ct.*, 224 Conn. 797 (1993), the courts noted almost identical language in support of their conclusion that the church is hierarchical. Indeed, in *Bennison*, the Court of Appeals of Michigan held that "[t]he trial court had correctly found that the Protestant Episcopal Church is hierarchically structured as a matter of law." *Bennison, supra* at 720. The United States Supreme Court and the highest courts in other States have reached the same view. See *Watson* v. *Jones*, 80 U.S. (13 Wall.) 679 (1871); *Olston* v. *Hallock*, 55 Wis. 2d 687 (1972); *Tea* v. *Protestant Episcopal Church in the Diocese of Nev.*, 96 Nev. 399 (1980); *Protestant Episcopal Church in the Diocese of N.J.* v. *Graves*, 83 N.J. 572 (1980); *Bishop & Diocese of Colo.* v. *Mote*, 716 P.2d 85 (Colo.), cert. denied, 479 U.S. 826 (1986); *Rector, Wardens, & Vestrymen of Trinity-St. Michael's Parish, Inc.*, supra at 807-808. To our knowledge there are no judicial holdings to the contrary.[29]

---

[27]By way of example, Title I, Canon 13, § 1 of PECUSA provides that "[e]very Congregation of this Church shall belong to the Church in the Diocese in which its place of worship is situated." Title I, Canons 10, 13, and 14 of PECUSA further describe the governing relationship among PECUSA, each diocese, and each local parish.

[28]Canon 14, § 2, of the Diocese further provides that all bylaws adopted by any parish shall be "in all respects consistent" with the constitution and canons of the Diocese. Other Diocesan canons contain rules governing elections in each parish vestry (Canon 14, § 6) and duties with regard to parish business affairs (Canons 16, 17).

[29]In *Protestant Episcopal Church in the Diocese of Los Angeles* v. *Barker*, 115 Cal. App. 3d 599, cert. denied, 454 U.S. 864 (1981), the California Court of Appeals, while applying the "neutral principles" approach, appeared to assume that PECUSA is hierarchical. *Id.* at 625. That court concluded that one of the local churches involved in the dispute was a "subordinate body" of the

## III

Our conclusion that the Parish is a constituent part of a hierarchical church organization begins, but does not end, our inquiry. The First Amendment does not require a civil court to accept as binding every decision of the ecclesiastical authority of a hierarchical church. Where a dispute "involves no consideration of doctrinal matters," a civil court may assume jurisdiction and may "adopt *any* one of various approaches" for settling the dispute (emphasis in original). *Jones* v. *Wolf*, 443 U.S. 595, 602 (1979), quoting *Maryland & Va. Eldership of the Churches of God* v. *Church of God Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970) (Brennan, J., concurring). In *Jones* v. *Wolf*, *supra*, a majority of the members of a local church voted to separate from the national Presbyterian church. Applying a "neutral principles of law" approach, the Supreme Court reasoned that a court could scrutinize corporate documents in purely secular terms to determine which faction was entitled to ownership of disputed church property, even after a tribunal of the Presbyterian Church, one with a "generally hierarchical or connectional form of government," *id.* at 597-598, had reached a different conclusion. We are not persuaded that the dispute here permits a *Jones*-type analysis.

We observe, first, that in *Jones*, the only question presented was which faction owned certain real property. The Supreme Court observed that, where the church documents specify "what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy," a court may resolve the conflict. *Id.* at 603, 604. Even in those cases, however, the Supreme Court cautioned that, where "the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* at 604, citing *Serbian E. Orthodox Diocese, supra* at 709.[30]

Here the dispute is not one of property as such; the claim is

national body and, therefore, an express trust existed that gave the diocese the right to the local church's property. *Id.*

[30]Professor Tribe has summarized the nature of the inquiry required under the neutral principles of law approach as follows: "If the documents contain both secular and nonsecular language on such subjects, the court apparently must separate the secular language if possible. If the documents do contain

one of the corporate "independence," and in this instance we find the reasoning of the Supreme Court in *Serbian E. Orthodox Diocese, supra,* and *Kedroff* v. *St. Nicholas Cathedral,* 344 U.S. 94 (1952), more appropriate. *Serbian E. Orthodox Diocese* concerned a dispute resulting from a decision of a national church to remove a bishop and a request that another priest reorganize the local parish. In that context the Supreme Court said that civil courts are "bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Id.* at 713. The conflict here began when a majority of the Parish corporation passed a vote of no confidence in the rector, hardly a question of property. The dispute blossomed to encompass wider questions of church governance, including the method of selection of members of the vestry. The dispute has never involved any attempt to wrest the property or endowments from the Parish for the benefit of the Diocese or PECUSA. We recognize, of course, that whoever controls the Parish corporation has control over its assets. But even where resolution of a religious dispute "affects the control of church property in addition to the structure and administration" of the church, the case "essentially involves not a church property dispute, but a religious dispute the resolution of which under our cases is for ecclesiastical and not civil tribunals." *Serbian E. Orthodox Diocese, supra* at 709.[31] Similarly in *Fortin, supra* at 785, we concluded that a bishop's promise that he would not close the parish was not "property-based," even though the closing of the parish would affect the status of the

---

express, secular language, separable from nonsecular language, then that language dictates the outcome. If the documents do not contain such language, then the state's neutral rule, in favor of either general churches or local churches, determines the outcome. If the documents are silent and the state has no rule, then the court apparently must defer to the decision of the authoritative ecclesiastical body." (Footnotes omitted.) L.H. Tribe, American Constitutional Law § 14-11, at 1238 (2d ed. 1988).

[31]Here, as in *Serbian E. Orthodox Diocese, supra* at 723, n.15, "[n]o claim is made that the 'formal title' doctrine by which church property disputes may be decided in civil courts is to be applied in this case. . . . Indeed, the Mother Church decisions . . . reorganizing the Diocese in no way change formal title to all Diocesan property . . . only the identity of the trustees is altered by the Mother Church's ecclesiastical determinations."

parish property.[32] See *Kedroff, supra* at 121 (Frankfurter, J. concurring, with whom Black and Douglas, JJ., joined) ("Saint Nicholas Cathedral is not just a piece of real estate . . . . What is at stake here is the power to exert religious authority"); *Protestant Episcopal Church* v. *Graves*, 83 N.J. 581 (1980) ("The critical fact is that title to the property remains in the Rector, Wardens and Vestrymen of St. Stephen's Church in Plainfield").

In *Fortin*, in deciding whether to take jurisdiction over the matter, we distinguished between a dispute over church property and a religious dispute. The controversy in that case stemmed from a bishop's decision to merge two parishes. We held that the trial court had jurisdiction over only the claims that were "property based" because those claims could be resolved under well-established concepts of trust and property law. Here, in contrast, neither party has made any legal claim based on trust or property law.[33]

In a case involving an Episcopal church parish that attempted to secede from its diocese and PECUSA, the New Jersey Supreme Court concluded that "[t]he basic dispute herein is unquestionably, doctrinal in nature, the ecclesiastical determination of which incidentally affects the control over local church property." *Graves, supra* at 581. We are similarly persuaded that in this case the dispute is one of religious law and polity — the authority of the bishop and Diocesan convention to

---

[32] In the *Antioch Temple* case the distinction between property and governance disputes was not critical because the congregational structure of that religious organization allowed us to take jurisdiction over both aspects of the dispute. In *Primate and Bishops' Synod of the Russian Orthodox Church Outside Russia* v. *Russian Orthodox Church of the Holy Resurrection*, 35 Mass. App. Ct. 194 (1993), *S.C.*, 418 Mass. 1001 (1994), however, the Appeals Court carefully distinguished between the property and governance issues, finding that the parish was congregational as to the control of property, but hierarchical in terms of "internal administration, discipline and matters of faith." *Id.* at 195.

[33] The plaintiff did allege that the Diocese was claiming that the property of the Parish was held "in trust" for the Diocese and PECUSA. The bishop's godly judgment, issued two months later, made explicit that "[t]here [was] no intent . . . to change the legal ownership of real and personal property of the Parish." We observe that the canons of PECUSA and the Diocese both state that the property of any parish is held "in trust" for the Diocese and PECUSA. See Canon 7 of Title I of the Canons of PECUSA. Those canons long predate this dispute, and we are, in any event, not called on in this case to determine the meaning of that term. Cf. *Protestant Episcopal Church in the Diocese of Los Angeles* v. *Barker, supra* at 620-626.

determine how members of a church vestry may be elected, whether a corporation member is in "communion" with the Parish, and whether the corporation's constitution may be amended unilaterally in violation of canonical mandates. We conclude that the First Amendment requires that the complaint be dismissed for lack of jurisdiction.

## IV

The plaintiff insists that as a separately incorporated religious corporation it, and it alone, has the power to determine how members of the vestry shall be elected, and that any decision to the contrary is an unlawful interference with its corporate rights. We consider that claim because it implicates the free exercise clause of the First Amendment. First, we note that "religious organizations as spiritual bodies have rights which require distinct constitutional protection." L.H. Tribe, American Constitutional Law 1236 (2d ed. 1988). It is for this reason that the Supreme Court consistently has maintained that matters of church government must be as independent from secular control as matters of faith and doctrine. See *Serbian E. Orthodox Diocese, supra* at 721 ("We will not delve into . . . various church constitutional provisions . . . . It suffices to note that the reorganization of the Diocese involves a matter of internal church government, an issue at the core of ecclesiastical affairs . . . ."); *Kedroff* v. *St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952) (religious freedom encompasses the "power [of religious bodies] to decide for themselves, free from State interference, matters of church government as well as those of faith and doctrine"). A claim that a religious corporation established under State statute (as the Parish is) *may* not, as matter of State law, subject itself to a higher ecclesiastical authority would be a fundamental intrusion into church operations, and turn well-settled religious freedom jurisprudence on its head.

A similar claim of local independence from national authority was made in *Serbian E. Orthodox Diocese, supra.* In that case, relying on neutral principles of law, the Supreme Court of Illinois held invalid a reorganization by the national church of three local dioceses. It premised its ruling on a view that the early history of the local diocese "manifested a clear intention to retain independence and autonomy in its administrative affairs while at the same time becoming ecclesiastically and judicially an organic part of the Serbian Orthodox Church." Ac-

cording to the Illinois court, the constitution of the local diocese "confirm[ed] this intention." *Serbian E. Orthodox Diocese, supra* at 721. The United States Supreme Court reversed: "[T]he Supreme Court of Illinois substituted its interpretation of the Diocesan and Mother Church constitutions for that of the highest ecclesiastical tribunals in which church law vests authority to make that interpretation. This the First and Fourteenth Amendments forbid." It is entirely appropriate, therefore, to recognize that a hierarchical religious corporation, organized under Massachusetts law, has the power to subordinate itself to a higher tribunal, at least for the purposes at issue here.[34] The Parish did just that, in all likelihood at its inception, but at the very least by 1960 when its constitution was amended to make explicit its accession to the authority of the Diocese and PE-CUSA.

The Parish was organized pursuant to St. 1834, c. 183, § 6, codified at Rev. St. 1836, c. 20, § 28, now G. L. c. 67, providing for the incorporation of religious societies. General Laws c. 67, § 3, enables religious corporations to "exercise . . . divine worship, church order and discipline."[35] The statute further provides that a religious corporation has the power to

---

[34]Our analysis is not contradicted by a suggestion in *Primate & Bishops' Synod* v. *Russian Orthodox Church*, 35 Mass. App. Ct. 194, 201 (1993), *S.C.*, 418 Mass. 1001 (1994), cert. denied, 513 U.S. 1121 (1995), that a Massachusetts religious corporation may not agree that amendments to the articles of incorporation and bylaws be subject to the prior authorization of nonmembers of the corporation. The Appeals Court relied on *Greek Orthodox Community* v. *Malicourtis*, 267 Mass. 472 (1929), which was based on art. 3 of the Massachusetts Declaration of Rights, as amended by art. 11 of the Amendments to the Massachusetts Constitution. In this case, neither party has made a claim under art. 3 and we do not address that issue. Moreover, in *Primate & Bishops' Synod*, the articles of incorporation and bylaws of the local corporation were in conflict. In those circumstances we determined that the articles control. In this case there is no such conflict. Our analysis also does not conflict with *McNeilly* v. *First Presbyterian Church in Brookline*, 243 Mass. 331, 340 (1923), which relied on art. 3 in holding that the minority of a congregational church was unable to use the "implied trust" doctrine to control the selection of a pastor. We limited our holding to that point and did not address "the governing principles of law respecting schism or other religious controversies." *Id.* at 341. We also note that both *Greek Orthodox Community* and *McNeilly* were decided before the First Amendment was made applicable to the States. See *Everson* v. *Board of Educ.*, 330 U.S. 1, 15 (1947) (applying establishment clause to States); *Cantwell* v. *Connecticut*, 310 U.S. 296, 303 (1940) (free exercise clause made applicable to States).

[35]General Laws c. 67, § 3, states in its entirety:

describe the manner in which persons may become members, G. L. c. 67, § 4, and that certain officers must be appointed, G. L. c. 67, § 7. General Laws c. 67, § 11, provides further that the "prudential affairs of religious societies shall be managed by their assessors or by a standing committee." Nothing in the statutory scheme prohibits a hierarchical religious corporation from agreeing to accede to the discipline or governance requirements of a higher church authority. Its ability to do so accords with the "general principle" that "persons who have contractually bound themselves to adhere to the decisions of the ruling hierarchy in a private association may not obtain relief from those decisions in a civil court." *Serbian E. Orthodox Diocese, supra* at 732 n.* (Rehnquist, J., dissenting, with whom Stevens, J., joined) (stating that *Watson* v. *Jones,* 80 U.S. [13 Wall.] 679 [1871], and *Bouldin* v. *Alexander,* 82 U.S. [15 Wall.] 131 [1872], demonstrate this principle). See also *Wheeler* v. *Roman Catholic Archdiocese of Boston,* 378 Mass. 58, 64 n.5 (1979), quoting *Serbian E. Orthodox Diocese, supra.* In this case the Diocesan convention determined that all parish vestries should be elected democratically. In compliance with that canonical mandate, the bishop required that the members of the Parish vestry be elected by all of the Parish communicants. We see nothing in the statute that precludes that requirement.

There remains one further aspect of statutory law upon which we comment. State law (as well as the constitution of the Parish) provides that members of the corporation must be members of the church. G. L. c. 67, § 52. In this case, the bishop determined that the thirteen members who had voted to withdraw were no longer members of the Parish and, as such, could not serve as members of the corporation.[36] The judge concluded that the First Amendment precludes the court from determining whether the thirteen became ineligible to

---

"Churches connected and associated in public worship with such religious societies shall continue to have, exercise and enjoy all their accustomed privileges and liberties respecting divine worship, church order and discipline, and shall be encouraged in the peaceable and regular enjoyment and practice thereof."

[36]Article III of the Parish constitution provides: "No person shall be a member of this Corporation . . . who is a member of any other communion than that to which this Parish is attached." The rector had determined that the thirteen had ceased to be "communicants in good standing in the Parish of the

serve as members of the Parish corporation when they voted to withdraw. We agree. The record below on this point is a stark illustration of the potential entanglement of a civil court in the internal governance disputes of a church. The plaintiff offered affidavits from the thirteen individuals each stating, "I am not a member of any other church or of any communion outside the Episcopal Church." The Diocese responded that a statement circulated by those same individuals that "we shall soon find ourselves in communion with another Anglican bishop" was proof that the thirteen members had disqualified themselves. For a court to attempt to resolve these competing claims of loyalty to a community of faith would be an "impermissible intrusion into the Bishop's ecclesiastical authority." *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. 781, 785 (1994). See also *Greek Orthodox Community* v. *Malicourtis*, 267 Mass. 472, 482 (1929) (whether members of a local Greek Orthodox community had become ineligible to hold office as a result of replacing a priest without the authorization of the central church was a matter "purely ecclesiastical" in nature).

V

We vacate the order of the Superior Court entered on October 25, 1995, and the order and final judgment entered on January 10, 1997, and order that this complaint be dismissed.

*So ordered.*

---

Advent and have disqualified themselves from holding any office in the Parish, including in the Corporation."