**Episcopal Diocese of Massachusetts & others[1]** *vs.*
**Deirdre DeVine & others[2]** (and two companion cases[3]).

Nos. 01-P-637, 01-P-545, & 01-P-898.

Plymouth. Suffolk. June 12, 2003. - October 23, 2003.

Present: Cowin, Kantrowitz, & Green, JJ.

*Religion. Church. Constitutional Law,* Freedom of religion. *Jurisdiction,*
Ecclesiastical controversy.

In an ecclesiastical dispute where the plaintiffs sought injunctive and declara-
tory relief against displaced parish leaders who interfered with diocesan
rights of access to church property by refusing to surrender the keys to that
church, a Superior Court judge correctly determined, based on the record,
that the Episcopal Church is hierarchical, and that the parish involved in
the dispute was a subordinate mission within that church [726-727];
nevertheless, the court properly exercised jurisdiction over the plaintiffs'
complaint, where the ecclesiastical authorities themselves requested civil
enforcement of their resolution of the dispute concerning the scope of
diocesan authority to reclassify the parish as a mission and replace its lead-
ers — a matter subjected, by church structure, to the plaintiffs' control
[727-729].

A Superior Court judge properly dismissed a bequest matter and property
claims brought by displaced leaders on behalf of a church parish against
the diocese and its officials for lack of subject matter jurisdiction. [729]

This court concluded that a parish held its property in trust for its governing
diocese and religious organization, and that the parish's officers violated
the terms of that trust, as well as canonical prohibitions on transferring
property without diocesan approval, when they conveyed a leasehold inter-
est in a portion of the church to a certain trust, whose officers and direc-
tors were congregation members of that parish; therefore, any rights the
parish asserted under the lease were invalid. [729-733]

CIVIL ACTIONS commenced in the Superior Court Department
on March 5, July 6, and August 19, 1999, respectively.

[1]The Right Reverend M. Thomas Shaw, Richard L. Wainwright, Donald H.
Parker, individually and on behalf of Episcopal Church of St. Paul's in Brock-
ton (St. Paul's).

[2]James R. Hiles; W. Edward Fafard; John Doe, as trustee of trust funds of
St. Paul's; and Mary Moe, former member of the vestry of St. Paul's.

[3]St. Paul's Parish *vs.* Marion S. Palm, executrix, & another; and St. Paul's
Parish, Inc., & another *vs.* Episcopal Diocese of Massachusetts & others.

The cases were heard by *Linda E. Giles*, J., on motions to dismiss and for summary judgment.

*Edward W. Little, Jr.* (*Daniel J. Kelly* with him) for Deirdre DeVine & others.

*Edward Notis-McConarty* (*Maureen E. Curran* with him) for Episcopal Diocese of Massachusetts & others.

GREEN, J. Driven by disagreement over divers doctrinal matters, the leaders of St. Paul's Parish of Brockton took actions to separate from the Massachusetts Diocese (Diocese) of the Protestant Episcopal Church in the United States of America (PECUSA). The diocesan bishop asserted control over the parish, replaced the leaders and when the displaced leaders refused to surrender the church keys, commenced an action seeking injunctive and declaratory relief. A judge of the Superior Court entered summary judgment in favor of the Diocese in that action, and two related actions were thereafter dismissed.[4]

Because (i) PECUSA is a hierarchical religious organization, see *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass.*, 426 Mass. 268, 281 (1997), and (ii) the parties' dispute principally concerns the scope of diocesan authority over a subordinate parish, we are required under settled law to defer to the determination of diocesan authority within the hierarchy of the religious organization. We accordingly affirm the judgment of the Superior Court recognizing the Diocese's rights of access to the church property, and enjoining the defendants from interfering with such access.

I. *Background.* Organized in 1789, PECUSA traces its roots to the earliest days of post-revolutionary America. Within PECUSA are 113 discrete geographically defined dioceses. Within

---

[4]The two related actions were (i) an action characterized as one by St. Paul's Parish (the verified complaint was signed by Deirdre DeVine, one of the displaced leaders) seeking a declaration that the parish is entitled to the bequest from the estate of Robert W. Palm and seeking to enjoin the executrix of the estate from disbursing the proceeds to the Diocese (bequest action); and (ii) an action characterized as one by St. Paul's Parish and an incorporated trust, St. Paul's Columbarium Trust, Inc., seeking, inter alia, to enforce a lease of church property for a columbarium (columbarium action).

each diocese are separate parishes and missions.[5] PECUSA and its affiliated dioceses and parishes are governed by a national constitution and canons, and each diocese is also governed by its own diocesan constitution and canons. Further descriptive background of PECUSA and its hierarchical relationship to the subordinate dioceses, and to the parishes and missions within each diocese, appears in *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass.*, *supra* at 270-271.

St. Paul's Episcopal Church in Brockton (St. Paul's) formed as a mission of PECUSA in 1882, and incorporated in 1890 under P.S. 1882, c. 38 §§ 24-25.[6] As adopted on May 5, 1890, and revised on January 14, 1935, its bylaws provided (i) that St. Paul's "accedes to the Constitution, Canons, doctrine, discipline and worship of the Protestant Episcopal Church in the United States of America, and to the Constitution and Canons of the Diocese of Massachusetts, and acknowledges their authority"; and (ii) "that no amendment shall ever be made which shall in any degree release the Parish from its allegiance to the authority of the Protestant Episcopal Church in the United States of America or the Diocese within the limits of which the Parish may be . . . ." Those provisions remained untouched until 1996.

Beginning in 1994, out of disagreement with the Diocese and PECUSA on various doctrinal matters,[7] St. Paul's parish leaders took a series of steps to distance the parish from PECUSA and the Diocese. In 1994, St. Paul's voted to withhold diocesan assessments, a determination it reaffirmed the following year. In 1996, St. Paul's (i) ceased filing annual reports with the Diocese and (ii) voted (by its then leaders and members present at a

---

[5]As described in the affidavit of the diocesan bishop, M. Thomas Shaw, a mission is less independent than a parish, and operates under the direct control and supervision of the bishop, who appoints the mission's vicar and the members of its executive committee.

[6]See G. L. c. 67, providing for the continuation of existing religious societies previously organized under State statute.

[7]The affidavit of Deirdre DeVine cites in particular the adoption by the Diocese of policies allowing the ordination of practicing homosexuals and marriage of same sex couples. The record also reflects frustration by parish leaders with the diocesan response to allegations of sexual misconduct by its then rector. For background on the latter topic, see *Hiles* v. *Episcopal Diocese of Mass.*, 437 Mass. 505 (2002).

special meeting) to adopt new articles of organization and bylaws, which omitted any statement of allegiance to the Diocese or PECUSA. St. Paul's did not submit the new articles or bylaws to the Diocese for approval, and (not surprisingly) the Diocese took no action to approve them. The restated articles of organization were filed with the Secretary of the Commonwealth on April 19, 1996.

On October 29, 1998, the then leaders of St. Paul's incorporated St. Paul's Columbarium Trust, Inc. (Columbarium Trust) to "provide a sacred, serene, secure, and perpetual place of internment of cremated remains . . . within Saint Paul's."[8] By lease dated October 26, 1997,[9] St. Paul's leased to the Columbarium Trust for a term of twenty years (with four successive options to renew of twenty years each), at an annual rent of one dollar, an area of approximately 120 square feet within the St. Paul's church building (columbarium lease).[10]

On November 7, 1998, the Diocese adopted a canonical amendment empowering it to reclassify as a mission any parish which had not paid in full its diocesan assessments and, pursuant to that authority, reclassified St. Paul's as a mission. In early 1999, the diocesan bishop informed the congregation of St. Paul's of the appointment of a new vicar, and the appointment of a number of individuals to serve on the mission's executive committee in replacement of the former parish vestry. By letter dated January 26, 1999, the bishop asked the former vestry members to turn over all keys, property, books, and records for St. Paul's, but he received no response. Anticipating resistance to its efforts to gain control over the church property, the Diocese filed a complaint in the Plymouth Superior Court (first action) on March 5, 1999, seeking declaratory and injunctive relief to gain possession and control of the property. The two related actions, initiated by the leaders displaced by the Diocese, followed shortly thereafter.

II. *Disposition of Diocese's Complaint.* After hearing argu-

---

[8]According to the restated articles of organization of the Columbarium Trust, Deirdre DeVine is the clerk of the corporation.

[9]The record does not explain why the lease bears a date just more than one year prior to the incorporation of the tenant.

[10]The leased premises house a "columbarium" containing the cremated remains of at least one deceased St. Paul's parishioner.

ment on cross motions for summary judgment filed in the first action, and issuing a thorough memorandum of decision, the motion judge entered a judgment declaring that the Diocese and the leaders of St. Paul's installed by the bishop are entitled to the control and use of St. Paul's property, and enjoining the former parish leaders from interfering with such access and control.[11] In her memorandum of decision, the motion judge recognized the question of the court's jurisdiction over a dispute between members of a religious organization, concluding that jurisdiction was proper on the facts presented here.

The question of jurisdiction arises because the "First Amendment prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization." *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass.*, *supra* at 280, quoting *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. 781, 785, cert. denied, 511 U.S. 1142 (1994). Massachusetts courts traditionally have resolved the question of jurisdiction by examining the structure of the religious organization to determine whether it is hierarchical or congregational, or a combination of both. *Parish of the Advent*, *supra* at 280-281, and cases cited. If the religious organization is hierarchical in structure, courts presented with an internal church dispute generally are without authority to set aside the determination of the matter by the highest ecclesiastical authority within the church. *Id.* See *Serbian E. Orthodox Diocese* v. *Milivojevich*, 426 U.S. 696, 709 (1976). Indeed, "[i]t is in disputes involving hierarchical churches that civil courts must tread more cautiously, for the First Amendment 'permits hierarchical [churches] to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters.' " *Parish of the Advent*, *supra* at 280, quoting *Antioch Temple, Inc.* v.

---

[11]The judgment also declared that St. Paul's holds its real and personal property in trust for the Diocese and PECUSA. In the posture of the case on the Diocese's complaint, however, there was no actual controversy on that subject. See note 14, *infra*. We accordingly vacate that portion of the judgment. However, the question of the scope of St. Paul's interest in the property is relevant to determining the validity of the lease to the Columbarium Trust. See part III, *infra*.

*Parekh*, 383 Mass. 854, 861 (1981).[12] Based on our review of the record we conclude, consistently with the motion judge, with *Parish of the Advent* and (as applicable to St. Paul's itself) with *Hiles* v. *Episcopal Diocese of Mass.*, 437 Mass. at 508, that the Episcopal Church is hierarchical and that St. Paul's is a subordinate mission within it.[13]

Under a constitutionally permissible alternative approach, where a dispute directly concerns a purely secular matter (such as rights to church property) and does not implicate matters of church doctrine, discipline, or authority, a court may exert jurisdiction over, and resolve, the dispute by the application of neutral principles of law. See *Jones* v. *Wolf*, 443 U.S. 595, 602-603 (1979); *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. at 787. However, as noted in *Parish of the Advent*, 426 Mass. at 283-286, it is often difficult to separate matters of religious doctrine or discipline entirely from a dispute between competing church factions. The present dispute, similar to that in *Parish of the Advent*, arose out of a disagreement over the Diocese's authority to reclassify St. Paul's as a mission and to replace its leaders. See *id.* at 284. Though the Diocese sought by its complaint to establish its right to control the church

---

[12]If the religious organization is congregational rather than hierarchical, a civil court may give effect to an authoritative resolution by the governing church body within a local congregation. See *Antioch Temple, Inc.* v. *Parekh, supra* at 860. In either case, however, the role of the court is not to become involved in disputes over religious doctrine or internal church organization; instead, the court is to examine how the church has elected to govern itself, and to defer to the determinations of the official or body within the church imbued with authority over the matter in dispute. See *Wheeler* v. *Roman Catholic Archdiocese of Boston*, 378 Mass. 58, 61 & 64 n.5, cert. denied, 444 U.S. 899 (1979).

[13]As we have noted, the present dispute does not involve the question of title to the church property as such, but instead concerns the bishop's authority to designate the individuals authorized to act on behalf of St. Paul's. Accordingly, the defendants' attempt to portray PECUSA as "congregational with respect to property" is misdirected. Compare *Primate & Bishops' Synod of the Russian Orthodox Church Outside Russia* v. *Russian Orthodox Church of the Holy Resurrection, Inc.*, 418 Mass. 1001 (1994), cert. denied, 513 U.S. 1121 (1995). Similarly, since diocesan canons (to which St. Paul's acceded under its bylaws) required diocesan approval of any amendments to the articles of organization and bylaws of the parish corporation, the 1996 amendments to the articles of organization and bylaws purporting to eliminate the allegiance of St. Paul's to PECUSA and the Diocese were of no effect.

property, the action was precipitated by the displaced leaders' refusal to recognize the bishop's authority to remove them and their unwillingness to surrender keys to the property. Because the question of the right to use and possess the St. Paul's church property is inextricably intertwined with the question of which individuals hold authority to act on behalf of St. Paul's (a question that essentially depends on the authority of the Diocese and its bishop over the mission or parish), we consider the matter to be inappropriate for determination by application of neutral principles of law.[14]

That we are without authority to intervene in a nonsecular dispute within a hierarchical religious organization does not mean that we are entirely without jurisdiction over the Diocese's complaint.[15] Unlike the posture in *Parish of the Advent*, the present case arises on a request by the Diocese for civil enforcement of the rights determined by ecclesiastical authority. "The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones* v. *Wolf*, 443 U.S. at 602. It is one thing to defer to the determination of religious matters by ecclesiastical authorities, or even to decline jurisdiction over a request by dissident church members to reexamine or to set aside that determination. It is quite another to refuse jurisdiction over a request by the ecclesiastical authorities themselves for civil enforcement of their resolution of matters subjected, by church structure, to their control. Other courts have exercised jurisdiction within that limited scope where necessary to enforce ecclesiastical determinations within a hierarchical church. See, e.g., *Watson* v. *Jones*, 80 U.S. 679 (1871) (affirming declaratory

---

[14]Indeed, if the individuals installed as mission leaders by the bishop are recognized to hold the authority to act on behalf of St. Paul's, there is no actual controversy (as required to support entry of a declaratory judgment) over the Diocese's claim that St. Paul's holds its property in trust for the Diocese. The portion of the judgment declaring a trust in St. Paul's property for the benefit of the Diocese was accordingly inappropriate.

[15]Though the parties do not contest jurisdiction, they may not confer subject matter jurisdiction on the court, nor waive a failure of jurisdiction. The motion judge was of the view that the status of the Episcopal Church as a hierarchical organization would compel her to decline jurisdiction, unless the case permitted determination under neutral principles of law.

judgment enforcing determination of highest ecclesiastical authority of hierarchical church); *Tea* v. *Protestant Episcopal Church in the Diocese of Nev.*, 96 Nev. 399 (1980) (same); *Protestant Episcopal Church in the Diocese of N.J.* v. *Graves*, 83 N.J. 572 (1980) (same). We accordingly conclude that it was proper for the lower court to exercise jurisdiction over the plaintiffs' complaint for the purpose of entering the declaratory and injunctive relief necessary to enforce the ecclesiastical determination of the parties' dispute over the governance of St. Paul's.

III. *Related Actions.* Following the judge's order allowing the Diocese's motion for summary judgment, the two related actions commenced by the displaced leaders on behalf of St. Paul's were dismissed. In the bequest action, judgment entered on the allowance of a motion to dismiss; in the columbarium action, a judgment of dismissal entered on the parties' cross motions for summary judgment. Consistent with the analysis in the preceding section, we agree that the bequest action, and the property claims asserted on behalf of St. Paul's in the columbarium action, were properly dismissed, if for no other reason than a lack of subject matter jurisdiction. See *Parish of the Advent, supra* at 286.[16]

The claim by the Columbarium Trust of rights under the columbarium lease is in a somewhat different posture. The motion judge considered the question of the columbarium lease subsumed within her determination in the first action that St. Paul's holds its property in trust for the Diocese and PECUSA, and therefore treated the claim by the Columbarium Trust of rights under the columbarium lease as barred on grounds of issue preclusion. As we have observed, however, though the first action sought to determine who had rights to control the church property, the controversy framed in that ac-

---

[16]Similarly beyond the court's jurisdiction are the claims that (i) Richard Wainwright breached a fiduciary duty to St. Paul's by his failure to file amended articles of association severing its ties to the Diocese and PECUSA; (ii) the Diocese "has used the Court to hurt, molest or restrain the members of St. Paul's Parish from worshipping God in the manner and season most agreeable to the dictates of their own conscience"; and (iii) the actions of the Diocese in seeking to recover possession of the property of St. Paul's constitute a violation of G. L. c. 93A, § 2.

tion concerned the authority of the diocesan bishop to designate the individuals authorized to act on behalf of St. Paul's rather than the question of title to the property itself. Moreover, unlike the bylaws of St. Paul's, there has never been any provision within the corporate documents that established the Columbarium Trust subjecting the trust to the authority of the Diocese or PECUSA. Finally, the columbarium lease appears to have been executed before the bishop reclassified St. Paul's from a parish to a mission and discharged and replaced the dissident leaders.[17] Therefore, though we agree with the motion judge's conclusion that the Columbarium Trust holds no rights under the columbarium lease, we reach that conclusion by a slightly different analytical route.[18]

As a threshold matter, we agree that St. Paul's holds its property in trust for the Diocese and PECUSA, for substantially the same reasons stated by the motion judge in her analysis of the question under neutral principles of law in the first action. That trust exists principally and most clearly by virtue of PECUSA's adoption, in 1979, of Canon I.6.4 (the so-called "Dennis Canon"),[19] in combination with the statement in the

---

[17]As we have noted (see note 9, *supra*), the Columbarium Trust was not incorporated until approximately one year following execution of the lease. We see no reason why the lease would not have become effective, at the latest, upon such incorporation. The date of incorporation preceded the bishop's reclassification of St. Paul's as a mission and his installation of new leaders for the mission.

[18]In any event, the judgment should have declared the rights of the parties, rather than simply dismissing the complaint. See *Connery* v. *Commissioner of Correction*, 33 Mass. App. Ct. 253, 254 n.4 (1992).

[19]Canon I.6.4 provides:

"All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons."

Canon I.6.5 states:

"The several Dioceses may, at their election, further confirm the trust declared under the foregoing Section 4 by appropriate action, but no such action shall be necessary for the existence and validity of the trust."

bylaws of St. Paul's that it accedes to the Canons of PECUSA.[20,21] Various other factors also support the same conclusion. For example, PECUSA Canon I.7.3 provides that no vestry or other body authorized by civil or canon law to hold real property for any parish may alienate or encumber the property without the approval of the bishop and "standing committee" of the diocese of which the parish is a part.

To identical effect is the Diocese's cognate Canon IV.3.6 prohibiting the alienation or encumbrance of any property held by or for any parish without diocesan approval. The property at issue here had been held since its acquisition in 1887 and 1913 by the diocesan Trustees of Donations under an express trust for the benefit of the Diocese. The 1957 deed conveying the

[20]The Dennis Canon appears, in fact, to reflect an attempt by PECUSA to implement one illustrative example offered by the Court in *Jones* v. *Wolf* as a method for a hierarchical church to facilitate future resolution of church property disputes under neutral principles of law. See 443 U.S. at 606. The record does not reveal when in 1979 PECUSA adopted the Canon, but appellants' counsel confirmed at oral argument that it was after the issuance (on July 2, 1979) of the opinion in *Jones* v. *Wolf*. See *Bishop & Diocese of Colo.* v. *Mote*, 716 P.2d 85, 105 n.15 (1986) (stating that Dennis Canon was adopted in September of 1979).

[21]The appellants attempt to avoid the effect of the Dennis Canon by pointing to an expert affidavit submitted in opposition to the Diocese's motion for summary judgment, which states that the Dennis Canon is of prospective force only. At the very least, they argue, the effect of the Dennis Canon presents a disputed question of fact, making the case unsuitable for disposition on summary judgment. We disagree. Interpretation of the effect of the Dennis Canon under the bylaws of St. Paul's is a question of law, which the court is as well equipped as the expert to determine. In any event, as found in many of the cases in other jurisdictions which have considered similar property disputes within PECUSA, it would appear that the Dennis Canon merely confirmed the preexisting relationship between PECUSA, its subordinate dioceses, and the parishes thereunder. See, e.g., *Bishop & Diocese of Colo.* v. *Mote, supra*; *Rector, Wardens & Vestrymen of Trinity-St. Michael's Parish, Inc.* v. *Episcopal Church in the Diocese of Conn.*, 224 Conn. 797, 821-822 (1993); *Bennison* v. *Sharp*, 121 Mich. App. 705, 725 (1982); *Bishop & Diocese of Colo.* v. *Mote, supra* at 105; *Protestant Episcopal Church in the Diocese of N.J.* v. *Graves, supra* at 581. Contrast *Protestant Episcopal Church in the Diocese of Los Angeles* v. *Barker*, 115 Cal. App. 3d 599, 625 (1981) (concluding that no trust existed in favor of PECUSA or local diocese as to parishes whose articles of incorporation did not subject property to control of national church); *Bjorkman* v. *Protestant Episcopal Church in the United States of America of the Diocese of Lexington*, 759 S.W.2d 583, 586-587 (Ky. 1988) (finding no express trust in dispute arising prior to Dennis Canon).

property from the diocesan Trustees of Donations to St. Paul's stated that the conveyance was free of the trust imposed by the original deeds. However, that conveyance occurred within a relatively few years after the Diocese's adoption of Canon IV.3.6. In light of the then-existing requirement for diocesan approval of any transfer and the statement in the bylaws of St. Paul's stating its accession to the diocese in all matters of governance, the fact that in 1957 the property was placed in the name of St. Paul's free of the trust imposed by the deeds appears less a determination to release the property to the autonomous control of St. Paul's than a matter of administrative convenience.[22]

The conclusion that St. Paul's holds its property in trust for the Diocese and PECUSA establishes that St. Paul's officers violated the terms of that trust (as well as the diocesan canon prohibiting transfer of property without diocesan approval) when they conveyed a leasehold interest in a portion of the church to the Columbarium Trust. However, as we have described, the trust in favor of the Diocese arises under the provisions of the bylaws of St. Paul's and the canons of PECUSA and the Diocese, rather than under any recorded instrument. There would accordingly be some question of its effect on the interest claimed by the Columbarium Trust, were it not for the fact that the officers and directors of the Columbarium Trust were St. Paul's congregation members, and included Deirdre DeVine (a named defendant in the first action and the apparent leader of the displaced group). Since the Columbarium Trust is fairly charged with actual knowledge of

[22]The appellants suggest that in 1973 St. Paul's sold a parcel of land formerly used as a curate's residence, without seeking or obtaining approval of the Diocese. None of the affidavits in the record before the motion judge, however, make such an assertion based on personal knowledge; the affidavit of Deirdre DeVine merely observes that no reference to a request for such approval appears in the minutes of the parish vestry, and asserts that such a request would have been reflected in the minutes if it had been made. However, even if that property was conveyed without diocesan approval as claimed, that single instance would not call into any significant question the conclusion compelled by the weight of the other factors we have noted that the relationship among St. Paul's, the Diocese, and PECUSA was one in which the church property was held in trust for the national church, and not autonomously by the local parish.

the limitations on the right of St. Paul's to convey any interest in its property, it may not claim to be an innocent transferee so as to avoid invalidation of its claimed rights under the columbarium lease on grounds that it was conveyed in violation of the trust, or in the face of canonical prohibitions against transfer.[23]

IV. *Conclusion.* The judgment in the first action shall be modified to delete the declaration that St. Paul's in Brockton holds its real and personal property in trust for the Diocese and PECUSA and, as so modified, is affirmed.[24] So much of the judgment in the columbarium action that dismissed the claim for rights under the columbarium lease is vacated, and a new provision is entered to declare that the columbarium lease is invalid and creates no rights in the Columbarium Trust; the remainder of the judgment in that action is affirmed. The judgment dismissing the bequest action is affirmed.

*So ordered.*

---

[23]Our conclusion that the lease is invalid leaves the leased premises within the property owned by St. Paul's. The question whether the ashes held within the columbarium are "owned" by St. Paul's is not sufficiently developed on the record and arguments in this appeal for us to express a view on that subject.

[24]There is no merit to the appellants' claims that the portion of the judgment enjoining them from using the corporate names of St. Paul's is contrary to the order of the single justice that vacated an earlier, broader, injunction.