SPANISH CHURCH OF GOD OF HO-
LYOKE, MASS., INC., Church of God
International, Inc., Juan A. Garcia,
Plaintiffs

v.

Anthony R. SCOTT and the City
of Holyoke, Defendants.

Civil Action No. 09–30224–KPN.

United States District Court,
D. Massachusetts.

June 20, 2011.

Bradford S. Babbitt, Christopher F. Girard, Robinson & Cole, Hartford, CT, for Plaintiff.

John H. Fitz–Gibbon, Green, Miles, Lipton, White & Fitz–Gibbon, Northampton, MA, Holyoke Police Department, Holyoke, MA, David M. Hodge, Marien & Hodge, P.C., Springfield, MA, for Defendants.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Document No. 70)*

NEIMAN, United States Magistrate Judge.

Presently before the court are federal and state civil rights claims brought by the Spanish Church of God of Holyoke, Mass., Inc., the Church of God International, Inc., ("Church of God International"), and Juan A. Garcia ("Bishop Garcia") (together "Plaintiffs"). Pursuant to Fed.R.Civ.P. 56, the City of Holyoke and Anthony R. Scott, in his capacity as Chief of Police (together "Defendants"), have moved for summary judgment on the remaining two claims against them (Counts One and Two).

The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. For the reasons that follow, Defendants' motion for summary judgment will be allowed.

## I. Standard of Review

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir.1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## II. Procedural Background

Plaintiffs' amended complaint originally included seven counts against three groups of defendants: (1) the City of Holyoke and Police Chief Scott, (2) individually named police officers of the City of Holyoke (the "Officers"), and (3) individual parishioners who identify themselves as Directors of the Church (the "Directors"). At the motion hearing, however, Plaintiffs indicated that they were no longer pursuing the case against the Officers. They also indicated that they had settled their dispute with the Directors and would submit documentation to that effect. Plaintiffs also agreed to dismiss Count Seven, the civil conspiracy count, against the City of Holyoke and Chief Scott. Thus, the only claims which remain are the two against Defendants City of Holyoke and Chief Scott: Count One, a 42 U.S.C. § 1983 claim for violation of rights guaranteed by the First Amendment, and Count Two, a claim under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12 § 11I, for violation of the First Amendment and Article 46 of the Amendments to the Massachusetts Constitution.

## Factual Allegations

The parties generally agree to the following facts, which are construed in a light most favorable to Plaintiffs, the non-moving parties. Relatively minor disputes about certain facts are noted as necessary.

The Church, located at 377 Appleton Street in Holyoke (the "Church"), was affiliated with the Church of God International, a non-profit organization based in Cleveland, Tennessee. The parties agree that, as a matter of record title, the Appleton street property is owned by the Church of God Holyoke, Inc. (Pls.' Statement of Facts (Pls.' SOF) Doc. No. 74 ¶ 14.) In November of 2009, the presiding pastor of the Church passed away and, later that month, Bishop Garcia assumed status as interim pastor, despite resistance by some members who favored appointment of Aida Villegas, the deceased pastor's wife.

On December 8, 2009, a meeting was held at the Church, during which a discussion between Bishop Garcia and some parishioners became heated, prompting one of the parishioners to call the police. (Defs.' Statement of Facts (Defs.' SOF) Doc. No. 70 ¶ 8.) Officers Arthur Cranshaw and Liam Gleeshen responded to the call and entered the building through the back door, located next to a sound booth; either the police officers or Bishop Garcia, who was speaking into a microphone at the time, asked the sound technician to turn off the microphone. (*Id.* ¶ 10.) The officers remained in the building for approximately ten minutes, until Aida Villegas indicated that their presence made her

uncomfortable, at which point they left. (*Id.* ¶ 11.) While there, the officers did not threaten Bishop Garcia or the congregation. (*Id.* ¶ 12.)

On December 13, 2009, Bishop Garcia was served with a "Notice of Trespass" (the "Notice") from Ronald R. LaRocque, an attorney. There is some dispute as to who authorized the Notice. Defendants maintain that it was requested by the Directors of the Church; Plaintiffs assert that no election for directors or officers had been held as of December 20, 2009.[1] (*Id.* ¶ 13.) In any event, Bishop Garcia's receipt of the Notice and his understanding of its purpose are not disputed. One day after Bishop Garcia received the Notice, Agustin Rosa—who, according to Defendants, was a Director of the Church—made a complaint to the Holyoke Police Department that Bishop Garcia was trespassing. (*Id.* ¶ 14.)

In response, Officer James Bartolomei and another officer went to the Church where they spoke with Bishop Garcia, who identified himself and explained his role. (Defs.' SOF ¶ 15.) Officer Bartolomei was unable to determine who owned the premises and, therefore, "didn't know who had a right to trespass who." (Pls.' SOF ¶¶ 32–33.) After speaking with Bishop Garcia, the officers asked Mr. Rosa to leave the premises and advised the remaining parties that the matter appeared to be a civil dispute to be resolved amongst themselves and that the police would take no action in the matter. (Defs.' SOF ¶ 16.) The police officers then left the Church and reported to headquarters via radio that they had "cleared" the premises. (*Id.* ¶ 19.) Following the police officers' departure, Bish-op Garcia also left and went to a local bank with a parishioner. (*Id.* ¶ 17.)

Plaintiffs admit that Officer Bartolomei "cleared" the Church at 11:42 a.m.; there is, however, some dispute as to the exact timing of the ensuing events. (Pls.' SOF ¶ 35.) According to Chief Scott, elicited during his deposition, after hearing that Officer Bartolomei "cleared" the Church premises he called Sergeant Cruz, Bartolomei's supervisor, to ask if a trespass notice had been issued. (Defs.' SOF ¶ 19.) When Sergeant Cruz confirmed that such a notice existed, Chief Scott told him to arrest the pastor if he was still there. (*Id.*) In some contrast, Plaintiffs assert that Chief Scott called Sergeant Cruz at 12:30 p.m., and that the timing of that call, forty-five minutes after Officer Bartolomei reported clearing the premises, casts doubt on Chief Scott's testimony that he contacted Sergeant Cruz upon hearing the other officers cleared the Church. Defendants, in response, dispute the exact time of the call, pointing to Sergeant Cruz's deposition testimony, in which he conveys uncertainty about the time of the call, stating it was "in the afternoon, somewhere around lunch time." (Defs.' Resp. to Pls.' SOF (Defs.' Resp.) Doc. No. 76 ¶ 38.) Also unclear, is whether Chief Scott saw a copy of the trespass order before or after calling Sergeant Cruz; he testified that he doesn't "remember exactly." (*Id.* ¶ 55.)

The parties do agree, however, that at the time of Chief Scott's call to him, Sergeant Cruz was unaware that two other officers had gone to the church earlier that day. In any event, after speaking with Chief Scott, Sergeant Cruz radioed Officer Bartolomei and conveyed the order to ar-

---

1. In support, Plaintiffs offer affidavits signed by certain Church members on December 20, 2009, stating that they received no notice of a meeting to vote for officers or directors of the Spanish Church of God of Holyoke, Mass., Inc., nor did they attend such a meeting or so vote. The affidavits go on to state these members' support of Bishop Garcia as the "only duly authorized Pastor." (Pls.' SOF, Ex. C.)

rest Bishop Garcia if he was still at the premises. (Pls.' Resp. to Defs' SOF (Pls.' Resp.) Doc. No. 74 ¶ 20.) Sergeant Cruz then went to the church and met Officer Bartolomei, who subsequently entered the church and asked the secretary to call Bishop Garcia. (Pls.' SOF ¶¶ 40–43.) Once on the telephone, Officer Bartolomei told Bishop Garcia that, "if you come back to the church, I'm going to place you under arrest per order of the Chief of Police" and instructed him that if he had an issue with that order he could take the matter up at the police station. (*Id.* ¶ 43; Defs.' SOF ¶ 21.)

Immediately thereafter, Bishop Garcia went to police headquarters and, using the telephone in the lobby, spoke to Chief Scott. (Defs.' SOF ¶ 22.) There is a bit of a dispute as to exactly what each party said to the other but, in general, the parties agree that Chief Scott told Bishop Garcia that a court order had been entered which stated that he was trespassing if he entered church property. (Pls.' SOF ¶ 63.) After Bishop Garcia explained that the Notice was in the form of a letter from a lawyer, Chief Scott told him the letter "was a court order in [his] eyes" and that "it was enough to have [Bishop Garcia] arrested" if he returned to the Church. (*Id.*) Both parties also agree that, by the time Chief Scott spoke to Bishop Garcia, he had received and looked over a copy of the Notice. The parties agree as well that Bishop Garcia offered to show Chief Scott the documentation of his role in the Church but Chief Scott refused to see him, telling him instead that he should go to court if he had an issue with the Notice. (Defs.' SOF, Ex. B; Garcia Dep. 69:15–21, Oct. 12, 2010.) After approximately three minutes, the call ended. (Pls.' SOF ¶ 63.)

### III. Discussion

The court will first briefly address the MCRA claim against the City of Holyoke and Chief Scott arising under Mass. Gen. Laws ch. 12 § 11I. The court will then turn to Plaintiffs' Section 1983 claims against them.

### A. MCRA claims against the City of Holyoke and Chief Scott (Count Two)

Pursuant to the MCRA, Plaintiffs charge both the City of Holyoke and Chief Scott with violating their First Amendment right to freedom of religion. The MCRA requires Plaintiffs to prove that Defendants interfered, or attempted to interfere, with their exercise or enjoyment of rights secured by the constitution or laws of either the United States or Massachusetts, by threats, intimidation, or coercion. *See* Mass. Gen. Laws ch. 12 § 11I. However, as Defendants argue and as Plaintiffs conceded at the motion hearing, a municipality cannot be sued under the MCRA. *See Kelley v. LaForce,* 288 F.3d 1, 11 (1st Cir.2002) (citing *Howcroft v. City of Peabody,* 51 Mass.App.Ct. 573, 747 N.E.2d 729, 743 (2001) (concluding that a municipality is not a 'person' covered by the Massachusetts Civil Rights Act)). Accordingly, the City of Holyoke is entitled to judgment on this claim. Similarly, because the claim is also directed at Chief Scott in his official capacity, he too is entitled to summary judgment on Count Two, as a claim against a city official in his official capacity is, for all intents and purposes, a claim against the city. *See Sampson v. Town of Salisbury,* 441 F.Supp.2d 271, 278 (D.Mass.2006) ("A claim brought against a government official in his or her official capacity 'is, in all respects other than name, to be treated as a suit against the [governmental] entity.'") (quoting *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). This was conceded by Plaintiffs at oral argument as well. Accordingly, summary

judgment will be granted both the City of Holyoke and Chief Scott on Count Two.

B. *Section 1983 claims for violation of First Amendment rights against the City of Holyoke and Chief Scott (Count One)*

■ Plaintiffs also charge the City of Holyoke with violating their First Amendment right to the free exercise of religion pursuant to Section 1983. Because this claim, too, is against Chief Scott in his official capacity, the court, as discussed above, treats it as a suit against the municipality. *See Kentucky*, 473 U.S. at 166, 105 S.Ct. 3099. Section 1983 provides a cause of action against any person who "under color of [state law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Liability under Section 1983 accrues if two elements are satisfied: first, a plaintiff must establish that a defendant acted under color of state law and deprived the plaintiff of rights secured by the Constitution or federal law; second, a plaintiff must show that "the defendant's conduct was the cause in fact of the alleged deprivation." *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir.2008) (quoting *Rodriguez–Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir.1997)).

■ Although a municipality is considered a "person" for purposes of Section 1983 liability, it cannot be held liable on a *respondeat superior* theory of liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, a municipality's liability is limited to instances in which "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or instances of less formal ac-

tions that are nonetheless considered governmental "custom." *Id.* at 690–691, 98 S.Ct. 2018. Such custom or policy may be construed from "a single decision by municipal policymakers under appropriate circumstances," but liability attaches only if the "decision-maker possesses final authority to establish municipal policy with respect to the action ordered." *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (single action of county sheriff may be municipal policy if the sheriff had policymaking authority). It must be understood, however, that "not every decision by municipal officers automatically subjects the municipality to Section 1983 liability." *Id.* at 481, 106 S.Ct. 1292.

Here, Plaintiffs acknowledge that the City of Holyoke, *qua* city, had no policy or custom subject to a challenge in this action. Rather, Plaintiffs assert, Chief Scott himself was a decision maker vested with the authority to establish governmental policy with regard to the enforcement of trespass orders. Chief Scott's policy, Plaintiffs contend, ran afoul of Section 1983.

■ Before addressing this issue, however, the court will first address Plaintiffs' contention that the Notice here was invalid under the authorizing state statute, which in pertinent part provides as follows:

Whoever, without right, enters or remains in or upon the dwelling house, buildings, boats or improved or enclosed land, wharf, or pier of another . . . after having been forbidden so to do by the person who has lawful control of said premises, either directly or by notice posted thereon, or in violation of a court order . . . shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than thirty days.

Mass. Gen. Laws ch. 266, § 120. Plaintiffs, of course, do not assert that the statute is unconstitutionally vague under the First and Fourteenth Amendments to the Constitution; that challenge has long been rejected. *See Hurley v. Hinckley,* 304 F.Supp. 704 (D.Mass.1969), *aff'd. sub nom. Doyle v. O'Brien,* 396 U.S. 277, 90 S.Ct. 603, 24 L.Ed.2d 469 (1970) (per curiam). Rather, Plaintiffs assert that the Notice was not authorized by the person "in lawful control" of the property. More specifically, they argue that Bishop Garcia—not the Directors who issued the Notice—had lawful control of the property given his appointment by the Spanish Church of God International as interim pastor. Plaintiffs also posit that the Notice was "facially suspect" because it was in the form of a letter, not a court order, and therefore should not have been enforced without additional inquiry.

The Massachusetts statute does not require that a notice of trespass be issued by a court. By its very terms, the statute permits the issuance of a trespass notice by a person "in lawful control" of the premises, including, by implication, that person's attorney. As Defendants assert, notices of trespass in the form of an attorney's letter are authorized, if not commonplace. As for a court-ordered trespass notice, the statute merely provides that "proof that a court has given notice of such a court order to the alleged offender shall be prima facie evidence that the notice requirement of this section has been met." Mass. Gen. Laws ch. 266, § 120. Thus, it may well be, as Plaintiffs posit, that something more is required of a police officer presented with a trespass notice which

lacks the prima facie weight of a court order, although they cite no case-law to that effect. Here, however, there is no dispute that the Notice was served on Bishop Garcia and that he understood its import.[2]

■ As to their constitutional argument, Plaintiffs, as an initial matter, have failed to offer any support for their assertion that Chief Scott himself had "final policy-making authority under Massachusetts law" with regard to trespass notices, thereby leaving the court free to conclude that the alleged constitutional violation was not caused by a municipal policy or custom. *See Kelley v. LaForce,* 288 F.3d 1, 10 (1st Cir.2002) (affirming district court's decision on summary judgment that action was not municipal policy based on lack of evidence of police chief's policy-making authority); *see also Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292 ("whether an official had final policymaking authority is a question of state law"). Nonetheless, the court will assume for present purposes that Chief Scott had such power, if only in the context of this one instance.

■ Still, Plaintiffs have not articulated what they believe to be Chief Scott's offending policy. This failure on Plaintiffs' part could well be because they have not pursued their Section 1983 claims with any reference to the standards set forth in *Monell,* 436 U.S. 658, 98 S.Ct. 2018, and *Pembaur,* 475 U.S. 469, 106 S.Ct. 1292, described above. The court in *Pembaur* also explained that "municipal liability under Section 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among vari-

---

2. In this regard, Plaintiffs made much of a statement by Sergeant Cruz that he might not enforce a notice of trespass written as a letter because "ten times out of ten" such a notice is in the form of a court order. The same officer, however, explained that he would have and has enforced requests to remove unwanted guests by phone or in person, and that he would enforce notice in the form of a letter if it was served on the recipient, as was the case here. (Defs.' Resp. ¶¶ 45–46; Pls.' SOF ¶¶ 45–46.)

ous alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483, 106 S.Ct. 1292; *see also Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("'policy' generally implies a course of action consciously chosen from among various alternatives"). The policy at issue in *Pembaur* concerned the service of capiases by forcible entry ordered by the county prosecutor and carried out by the deputy sheriffs; the sheriff testified that seeking out and following the prosecutor's advice was the department's practice in appropriate circumstances, and the court determined that, pursuant to standard procedure, "the prosecutor made a considered decision based on his understanding of the law and commanded the officers forcibly to enter petitioner's clinic." *Id.* at 484–85, 106 S.Ct. 1292.

Here, Plaintiffs have not identified a similarly deliberate course of action. At best, Plaintiffs, in their supporting memorandum, simply contrast Chief Scott's "self imposed ignorance" with the first responding officer's decision not to enforce the Notice after learning of an internal church dispute. Such a contrast, however, does not a policy make. When asked about this at oral argument, Plaintiffs settled upon Chief Scott's policy as "arrest first, ask questions later," an approach to trespass notices which, Plaintiffs claim, falls short of constitutional requirements. As indicated, however, no arrest ever took place. More to the point, Plaintiff's description—although having a Paladin "have gun will travel" flair to it—gets them no closer to articulating what they claim to be Chief Scott's policy. If anything, the evidence indicates that, to the extent Chief Scott had a policy, it was simply to enforce valid trespass notices and there is no evidence that its implementation ran afoul of constitutional requirements.[3]

Persevering, Plaintiffs assert that Spanish Church of God International is a hierarchical church and, as such, Chief Scott should not have "interfered" with internal church matters in the way he did. In support, Plaintiffs point to case law describing the circumscribed roles courts have over "questions of discipline, or of faith, or ecclesiastical rule, custom or law." *See Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (First Amendment requires civil courts to avoid controversies requiring resolution of disputes over religious doctrine). Here, Plaintiffs assert, the Church of God International "ha[d] spoken" and had appointed Bishop Garcia pastor and, by doing so, effectively de-

---

**3.** Chief Scott testified at his deposition that the court, and not the police department, was the proper venue for disputes over the validity of the notice:

Q: What did he (Bishop Garcia) say to you when you spoke to him on the phone?
A: He tried to explain to me the legal procedures for serving notice of trespass, and I tried to explain to him the legal procedure for serving trespass notice and what would happen if he violated a trespass notice, and he refused to listen to me ...
Q: What other subjects did you discuss with him?
A: That was it, just not go on the property; he'd be violating the notice of trespass

therein. I informed him that the Court was open, he could walk right across the street, go to the court, get a hearing on the matter, and resolve it, whatever it was, and I tried to convince him to avail himself of that. (Defs.' Resp., Exh. C.; Scott Dep. 21:15–22:5.) While Plaintiffs dispute the exact nature of Chief Scott and Bishop Garcia's conversation—Bishop Garcia remembers it as a more succinct, "if you don't like my decision, take me to court"—Chief Scott's refusal to enmesh himself in the dispute over Church ownership, the material issue here, is not disputed.

clared him as the person "in lawful control" of the property. Arguing that "the first Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization," *Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), Plaintiffs argue that Chief Scott was barred by the First Amendment "from questioning or overturning" the Church of God International's decision to appoint Bishop Garcia pastor.

Plaintiffs' line of reasoning, in the court's opinion, is unpersuasive as it concerns the present situation. As an initial matter, it is not an accurate description of the evidence before the court, even when looked at in a light most favorable to Plaintiffs. To be sure, the Church of God may well be a hierarchical church and, as such, endowed with the right to resolve disputes about church governance internally without interference from the courts or, it follows, civil servants. *See Serbian E. Orthodox Diocese,* 426 U.S. at 710, 96 S.Ct. 2372. As asserted by Plaintiffs, the Church's internal dispute over the status of its pastor is the type of dispute into which a court ought not wade. *See Fortin v. Roman Catholic Bishop of Worcester,* 416 Mass. 781, 625 N.E.2d 1352, 1354 (1994) ("the First Amendment prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization") (quoting *Alberts v. Devine,* 395 Mass. 59, 479

N.E.2d 113, 121 (1985)). That dispute, however, is not before the court and was not before Chief Scott at the time he enforced the Notice. Simply put, Plaintiffs' claim that Chief Scott "cho[se] who should serve as pastor of the Church of God of Holyoke" is a mischaracterization of the role he played in enforcing the Notice. As Chief Scott pointed out in his deposition testimony, given the number of trespass orders the police station receives on a daily basis, an in-depth inquiry into whether each one was issued by the owner of the property is not feasible or within the scope of the police department's responsibility to enforce such orders.[4]

In sum, there is simply no evidence that Chief Scott intended to enforce the Notice against Plaintiffs to discourage their exercise of First Amendment rights. Plaintiffs assertions are speculative at best and, therefore, insufficient to defeat summary judgment. *See Thompson v. Coca–Cola Co.,* 522 F.3d 168, 175 (1st Cir.2008) ("To defeat a motion for summary judgment, the evidence offered by the adverse party cannot be 'merely colorable' or speculative.") (citing *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993)).

Moreover, the cases relied on by Plaintiffs—in which courts at least deferred to certain ecclesiastical determinations—are simply inapposite. For example, in *Serbian E. Orthodox Diocese,* the Supreme Court overturned the Illinois Supreme Court's finding that Mother Church pro-

---

**4.** Q: Now you understand the claim was that he (Garcia) couldn't go into a church, that's what you were ordering?

. . .

CHIEF SCOTT: I was saying he couldn't trespass into that church because the owners of the property did not want him there. As to who owned the property, I don't know. I received trespass notices on a daily basis from individuals. I don't research the trespass notice to find out if an individual

actually owns the property. If it's contested, they go right over to court and it's handled there. Do you realize how much police resources it would take to sit down and go through every trespass notice to do an investigation to find out who owns the property? I don't think we're supposed to go and do that.

(Defs.' Resp., Ex. C; Scott Dep. 39:20–40:11, Oct. 1, 2010.)

ceedings, which led to the reorganization of three churches and the removal of one of its bishops, were defective under the internal regulations of the church. 426 U.S. at 712–713, 96 S.Ct. 2372. The Supreme Court held that inquiries made by the Illinois Supreme Court constituted improper judicial interference with decisions of the highest ecclesiastical tribunals of a hierarchical church, in violation of the First Amendment. *Id.* at 708, 96 S.Ct. 2372. Similarly, in *Episcopal Diocese v. Devine,* 59 Mass.App.Ct. 722, 797 N.E.2d 916 (2003), the court ruled in favor of a hierarchical church's diocesan authorities, deferring to their decision to replace dissenting leaders in the wake of an internal church schism; the court deferred to and ordered declaratory relief in favor of leaders of the hierarchical church after such leaders resolved matters of internal church governance. Here, however, the court is not presented with claims seeking enforcement of the Spanish Church of God International's decision to appoint Bishop Garcia as interim pastor. The court is simply confronted with Plaintiffs' First Amendment claim against the Chief of Police for enforcing a trespass notice.

The action presently before the court, therefore, is more akin to the cases cited by Defendants, in which courts have upheld the enforcement of valid trespass orders, even if against members of the clergy. *See, e.g., United States v. Acevedo–Delgado,* 167 F.Supp.2d 477, 480 (D.P.R. 2001) (rejecting pastor's First Amendment claim because federal trespassing statute is general and neutral); *Commonwealth v. Cartwright,* 447 Mass. 1015, 856 N.E.2d 177, 179 (2006) (rejecting defendant Pastor's contention that his prosecution and conviction for trespassing violated the First Amendment given jury's finding that defendant Pastor did not have lawful control over property). While both of those decisions concerned criminal prosecutions,

they provide guidance to the effect that the First Amendment does not preclude the enforcement of valid and neutral laws against members of the clergy. Indeed, it is Chief Scott's threatened criminal enforcement of the Notice which lies at the heart of Plaintiffs' claims.

To be sure, given that the Notice was engendered by the Directors themselves, Plaintiffs may well have had viable claims against them. *See Strahan v. Frazier,* 156 F.Supp.2d 80, 99 (D.Mass.2001) ("Property owners may not rely on the criminal trespass statute to circumvent constitutional protections.") (citing *Alexis v. McDonald's Rests. of Mass., Inc.,* 67 F.3d 341, 350 (1st Cir.1995)). Plaintiffs, however, informed the court at oral argument that their claims against the Directors have been settled.

██ Finally, Plaintiffs argue that Chief Scott violated their First Amendment rights by discriminating against their religion. The sole basis for this argument is a comment Chief Scott made during his deposition that, as a Catholic, he knew members of the Catholic Church could not issue a trespass notice against a priest because the Pope or Bishop, not parishioners, own church property. (Pls.' SOF ¶ 56.) He went on to explain his understanding that, in certain religions, the congregation owns the church and, therefore, members have the right to issue trespass notices. (*Id.*) These comments, made well after the incidents giving rise to this action took place, are insufficient to show that, at the time Chief Scott decided to enforce the Notice, he did so for discriminatory reasons. Quite to the contrary, Chief Scott made it clear during his testimony that his primary concern when confronted with trespass notices is the prevention of violence, given his experience that "99.9% of the time [trespass notices are issued] to prevent

some type of violence from occurring." (Defs.' Resp. ¶ 58.) Chief Scott went on to explain that even knowing then (at the time of his deposition) that the Church might be similar to the Catholic Church, in which the international organization controls local property, he would still enforce the Notice given the dispute about Church ownership. (Defs.' Resp. ¶ 57; Scott Dep. 26:5–23.) In this light and absent any proof that Chief Scott enforced the Notice in a discriminatory fashion against Bishop Garcia or the Church itself, the court finds no genuine issue of material fact regarding Chief Scott's benign purpose in enforcing the Notice.

■ In sum, while the First Amendment undoubtedly prohibits laws that infringe on the free exercise of religion, it does not exempt individuals from compliance with valid laws. *See Employment Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872, 878–79, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."). Bishop Garcia was as subject to the Notice as any other citizen and Chief Scott, in enforcing a valid trespass notice, did not encroach on the protections afforded religious institutions with regard to internal organizational disputes.

### Conclusion

For the reasons stated, the court ALLOWS Defendants' motion for summary judgment with respect to Counts One and Two. In addition, given Plaintiffs' representations at the summary judgment hearing, the court also dismisses Count Seven against the City of Holyoke and Chief Scott as well as all claims against the Officers. Further, having been advised by Plaintiffs that their claims against the Directors have been settled, IT IS ORDERED that those claims are hereby dismissed without costs and without prejudice to the right of such parties, upon good cause shown, to seek to reopen the action within thirty days if settlement is not consummated.